Below is an Opinion of the Court.

 _Randall L. Dunn_
RANDALL L. DUNN
U.S. Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| In Re: ) | Bankruptcy Case |
| ) | No. 09-35218-rld13 |
| KARLA STEINHAUSER, ) | |
| ) | |
| Debtor. ) | |
| ) | |
| KARLA STEINHAUSER, ) | Adv. Proc. No. 09-03284-rld |
| ) | |
| Plaintiff ) | |
| ) | |
| v. ) | MEMORANDUM OPINION |
| ) | |
| PROMOCIONES TROPICAL, INC., et al. ) | |
| ) | |
| Defendants. ) | |

On September 28, 2010, I received evidence and heard testimony and argument at the trial ("Trial") on the debtor Karla Steinhauser's ("Ms. Steinhauser") complaint ("Complaint"), as amended, in an adversary proceeding ("Adversary Proceeding") to quiet title to certain real property located at 2010 Hwy. 101 N., Rockaway Beach, Oregon (the "Property"). At the conclusion of the Trial, I took the matter under advisement.

Page 1 - MEMORANDUM OPINION

In deciding this matter, I have considered carefully the testimony presented and exhibits admitted at the Trial, as well as arguments presented, both in legal memoranda and orally. I further have taken judicial notice of the docket and documents filed in this adversary proceeding and in Ms. Steinhauser's main chapter 13 case, No. 09-35218-rld13, and certain judgments on the docket of the United States District Court for the District of Oregon for purposes of confirming and ascertaining facts not reasonably in dispute. Federal Rule of Evidence 201; In re Butts, 350 B.R. 12, 14 n.1 (Bankr. E.D. Pa. 2006). In addition, I have reviewed applicable legal authorities.

In light of that consideration and review, this Memorandum Opinion sets forth the Court's findings of fact and conclusions of law under Federal Rule of Civil Procedure 52(a), applicable in this Adversary Proceeding under Federal Rule of Bankruptcy Procedure 7052.

### Factual Background

Deciding this Adversary Proceeding presents a substantial challenge because many of the relevant events occurred many years ago, the subject transactions are unorthodox, and a number of the major players either are dead or are imprisoned and/or unavailable to testify. The original defendants named in the Complaint were: 1) Promociones Tropical Inc. ("PTI"), an Oregon corporation that was administratively dissolved on May 20, 1988; 2) Baldomero Andrade ("Mr. Andrade"), who died in 1999; and Ruth Araiza (Ms. Araiza), the former wife of Mr. Andrade and the Personal Representative of his probate estate. Additional defendants named later were: Rosalba Andrade ("Ms. Andrade"), Mr. Andrade's wife at the time of his death; Baldomero Andrade Lopez (child of Mr. Andrade and

Ms. Andrade); and Jesus Araiza (fka Baldomero Andrade, Jr.), Luis Antonio Araiza, Ruth Mariela Araiza, Pablo Roberto Araiza, Ana Gabriela Araiza, and Cecilia Irene Araiza (collectively, children of Mr. Andrade and Ms. Araiza). The defendants are collectively referred to as the "Defendants."

A. <u>Ms. Steinhauser and the Property</u>

Ms. Steinhauser's father bought the Property for her in 1964. She resides and conducts business selling smoked crab/seafood products on the Property. She was credible as a witness at Trial, but appeared unsophisticated in business matters. At the time Ms. Steinhauser acquired the Property, it had a "broken-down shack" on it. She has made a number of improvements to the Property over the years and operated her business with hired help from 1964 to 1984, "making enough to pay the bills."

In 1981, Ms. Steinhauser met Amelia Lanier ("Ms. Lanier"), the daughter of the minister at Ms. Steinhauser's church. Ms. Steinhauser remembers Ms. Lanier as a very sharp dresser and a good speaker, who she grew to admire and trust.

During the 1980's, Ms. Steinhauser's business was getting bigger than she felt she could handle on her own, and Ms. Lanier suggested that they form a partnership (the "Partnership") together to expand the business. Ms. Steinhauser and Ms. Lanier entered into a General Partnership Agreement on or about December 9, 1986. <u>See</u> Exhibit A. Ms. Steinhauser contributed the Property, and Ms. Lanier contributed $10,000 to capitalize the Partnership. Ms. Lanier was the Manager of the Partnership, overseeing its operations, including Partnership finances.

Ms. Steinhauser's duties were primarily operational–cooking and filleting fish.

In addition to its seafood business on the Property, the Partnership expanded to a location at S.E. 21st and Division in Portland. In 1990, Ms. Lanier obtained a Small Business Administration loan ("SBA Loan") to finance Partnership operations and fund the acquisition of equipment for the Portland location. Ms. Steinhauser does not know how the SBA Loan proceeds were spent.[1] However, apparently, the SBA Loan did not provide enough funds for the operations of the Partnership under Ms. Lanier's stewardship for long.

On or about August 31, 1993, on, as Ms. Steinhauser testified, "12-hours' notice," Ms. Steinhauser was called to come down to a title company office to sign loan documents. When she arrived, Ms. Lanier, Ms. Lanier's mother and Clifford J. Brigham ("C.J. Brigham") were present in the room. At some point, Mr. Andrade arrived. Ms. Steinhauser had no substantial experience in reading legal documents, and she was given no real opportunity to take the time to review the documents for the "loan transaction" (the "Loan Transaction") she was asked to sign.

What she signed were: 1) a Bargain and Sale Deed, dated

---

[1] Ms. Steinhauser testified that a portion of the SBA Loan ($60,000) was repaid from the proceeds of a foreclosure sale of property owned by Ms. Lanier's mother. The balance of the SBA Loan was assumed by Ms. Steinhauser. Proceeds from the sale of a home by Ms. Steinhauser paid down the SBA Loan by an additional $30,000. The balance of the SBA Loan is secured by a first lien interest on the Property. In Ms. Steinhauser's schedules, the SBA Loan is described as an economic development loan owed to the State of Oregon, with an outstanding balance on the petition date of $74,190. See Case No. 09-35218-rld13, Docket No. 8, filed 7/14/09, Schedule D.

Page 4 - MEMORANDUM OPINION

August 31, 1993, purporting to transfer the Property and certain real property owned by Ms. Lanier's parents to "Promociones Tropical" for stated consideration of $246,097.54; and 2) a Contract-Real Estate (the "Real Estate Contract"), dated August 30, 1993, purporting to transfer the same real properties, with "Promociones Tropical" identified as "seller," and Ms. Steinhauser, Ms. Lanier, and Ms. Lanier's parents collectively identified as "buyer," for stated consideration of $256,597.54. Some indication of the intent of the "Loan Transaction" is included in the "Additional Provisions Continued" on page 3 of the Real Estate Contract: The "buyer" could pay off the Real Estate Contract by assuming any underlying liens on the subject properties and by paying "seller" $62,500 "equity," plus unpaid interest accrued at 10% per annum. The "Additional Provisions Continued" go on to state that, "The entire principal balance plus all accrued interest shall be paid in full not later than four months from the date hereof by Buyer assuming the underlying liens and paying off Seller's equity." As "monthly payments," the "buyer" was required to pay any obligations accruing on said "underlying liens" plus payments of $520.83 per month to the "seller." See Exhibit H. Interestingly, a UCC-1 financing statement was filed on November 1, 1993, identifying PTI as the Secured Party and Ms. Steinhauser, Ms. Lanier and the Partnership as the Debtors in the Loan Transaction. See Exhibit X.

The title company's Loan Transaction worksheet shows only $52,000 coming from PTI, and after costs, "loan fees" and attorney fees, "net proceeds of loan" in the amount of $37,500.81 were deposited to West One Bank, and real property taxes of $3,628.09 were paid to Tillamook

Page 5 - MEMORANDUM OPINION

County. See Exhibit Z, at pp. 18-20.  Ms. Steinhauser admitted in her testimony that the $3,628.09 paid outstanding real property tax obligations on the Property, but she did not receive any of the other "loan proceeds" and does not know how they were spent.  She further testified that she never intended to transfer title to the Property and believed that she continued to own it.  In addition, Ms. Steinhauser testified that she did not make any payments on the Loan Transaction, but her understanding was that Ms. Lanier had made as many as four payments on the Loan Transaction.  See Exhibit N, at p. 1.

After the Loan Transaction, relations between Ms. Steinhauser and Ms. Lanier apparently deteriorated very rapidly.  At some point later in 1993-1994, Ms. Steinhauser discovered that Ms. Lanier was not paying Partnership business bills.  Shortly thereafter, the Partnership was dissolved, with Ms. Lanier taking most of the business equipment, but Ms. Lanier relinquished any ownership interest she had in the Property. See Exhibit K.  Ms. Lanier passed away from breast cancer early in 1997.

From 1996-1997, Ms. Steinhauser paid the real property taxes for the Property and is shown as the "payor" on the real property tax accounts for the Property.  No one ever attempted to collect the unpaid "loan" from her, and no foreclosure proceedings were initiated against the Property.  Following her chapter 13 bankruptcy filing, approximately 16 years after Ms. Steinhauser signed the Loan Transaction documents, she filed the Adversary Proceeding to quiet title in her name to the Property.

///

///

Page 6 - MEMORANDUM OPINION

B.  Mr. Andrade and the Loan Transaction

While Mr. Andrade did not pursue collection efforts against either Ms. Steinhauser or the Property during the remainder of his life, he did file a complaint (the "Andrade Complaint") in Washington County Circuit Court in his name "dba Promociones Tropical, Inc." against James R. Schaller, the attorney who was paid for work in relation to the Loan Transaction, for alleged fraud and negligence in rendering

> legal advice and preparation of documents necessary to complete a loan transaction, brokered by Pepe Chavez and "Funds UnLtd." wherein [Mr. Andrade] agreed to loan $52,000 to Karla Steinhauser and Amelia E. Lanier, David A. Lanier and Rosella B. Lanier (the "Borrowers") and [Mr. Andrade] was to receive the appropriate loan documents and security in the real property owned by the Borrowers and repayment of $62,500 which was to occur on or before January 1, 1994[.]

Exhibit I, at p. 2.  In his Answer to the Andrade Complaint, Mr. Schaller admitted that "the loan documents set forth a loan from plaintiff Baldomero Andrade to persons named Karla Steinhauser, Amelia Lanier, David Lanier, and Rosella Lanier in the amount of $62,500."  Exhibit J, at p. 2.  In his Trial Memorandum for trial on the Andrade Complaint, Mr. Schaller characterized the Loan Transaction as follows:

> Andrade was intending to make a private loan to individuals for approximately $50,000.00 with return on the loan of approximately $12,000.00 in 90 days. The loan was to be secured by property on the Oregon Coast.

Exhibit O, at pp. 1-2.  Apparently, Ms. Steinhauser was called as a witness at the trial of the Andrade Complaint, and she testified that she would try to pay Mr. Andrade.  Following trial, the Andrade Complaint was dismissed with prejudice, a result that was affirmed on appeal.  See

Page 7 - MEMORANDUM OPINION

Exhibits P and R.

C. <u>Mr. Andrade's Death and Probate Proceedings</u>

Following Mr. Andrade's death, his estate was probated, with Ms. Araiza serving as Personal Representative. The estate inventory, dated August 31, 2000, does not include any interest in the Property or any claim against Ms. Steinhauser. <u>See</u> Exhibit V, at pp. 1-3. The probate estate was closed after complete administration in 2001-2002.

Ms. Araiza and Ms. Andrade both testified at the Trial. Both testified credibly that Mr. Andrade did not discuss his business affairs with them during his life, and he never mentioned the Property to either of them.

D. <u>The Loan Transaction evaluated in light of Circumstantial Evidence</u>

In Ms. Araiza's trial memorandum, she suggests that Ms. Steinhauser contacted mortgage brokers Pepe Chavez and C.J. Brigham to arrange for the Loan Transaction with Mr. Andrade. There is no evidence in the record tending to establish that Ms. Steinhauser initiated contacts with either Pepe Chavez or C.J. Brigham to arrange for a loan. Ms. Steinhauser testified that her only contact with C.J. Brigham[2] was his presence at the signing of the Loan Transaction documents. She testified as to no contacts with Pepe Chavez, other than knowing that he had some involvement with the Loan Transaction. Pepe Chavez did not testify at the Trial.

---

[2] C.J. Brigham is serving a substantial term in federal prison after being convicted on multiple counts for wire fraud, mail fraud, money laundering and Social Security fraud. <u>See</u> Judgment in a Criminal Case and Amended Judgment in a Criminal Case, United States District Court for the District of Oregon, Case No. 06-272(1), Docket Nos. 151 and 155.

Page 8 - MEMORANDUM OPINION

However, Ms. Araiza further suggests that,

> Brigham and Chavez arranged and closed a transaction, "bridge loan" with [Mr. Andrade] as lender and [Ms. Steinhauser] as borrower. Chavez encouraged [Mr. Andrade] to make the loan because Chavez would also benefit.

Ruth Araiza Trial Memorandum, at p. 2.

While it is difficult to determine exactly how the Loan Transaction evolved, with so many parties unavailable so many years after the fact, it appears likely that if anyone sought out Mr. Chavez and C.J. Brigham to obtain a loan for the Partnership, it was Ms. Lanier, who oversaw the finances for the Partnership. The Real Estate Contract, in its substance, contemplates a "bridge loan," as suggested by Ms. Araiza. After being contacted by Ms. Lanier, Mr. Chavez and/or C.J. Brigham sought out Mr. Andrade to obtain the $52,000 they needed to fund the transaction. Mr. Andrade may have borrowed the $52,000, but the record is not clear on this point. (The title company's Loan Transaction worksheet reflects a payment of $8,570.00 to The Bank of Newport for "Loan Fees." See Exhibit 2, at pp. 18 and 20.) What is clear is that Mr. Andrade expected to recover a profit of at least $10,500, plus 10% interest, over the four-month term of the "bridge loan." In other words, if the Loan Transaction had worked as it was structured, Mr. Andrade would have made a profit in excess of 58% on his money, calculated as annual interest, before possibly sharing his gains with Mr. Chavez and/or C.J. Brigham, and Ms. Steinhauser and Ms. Lanier's parents would have been left holding the bag with highly leveraged properties.

It did not work out that way because Mr. Chavez and/or C.J. Brigham were not able to deliver the permanent financing required to

Page 9 - MEMORANDUM OPINION

fund the buy-out of "Promociones Tropical" under the Real Estate Contract at the end of the four-month term contemplated in the "Additional Provisions Continued." When the buy-out did not occur as contemplated, Mr. Andrade unsuccessfully tried to recoup his lost funds by suing the lawyer, Mr. Schaller, but he did not attempt to collect from Ms. Steinhauser, either because the Property and the property put up by Ms. Lanier's parents either were too encumbered to allow for a recovery by Mr. Andrade, or Mr. Andrade did not believe he could enforce the Bargain and Sale Deed and Real Estate Contract against Ms. Steinhauser.

### Jurisdiction

I have jurisdiction to decide the claims raised in the Adversary Proceeding under 28 U.S.C. §§ 1334 and 157(b)(2)(A), (B) and (O).

### Discussion

Quiet title actions are equitable in nature, allowing for the resolution of conflicting claims to real property. ORS § 105.605; Spears v. Dizick, 234 P.3d 1037, 1039 (Or. App. 2010) ("In general, a person may bring an equitable quiet title action to obtain resolution of a dispute relating to adverse or conflicting claims to real property.").

In this case, since the Loan Transaction closed in 1993, title to the Property has been held in the name of "Promociones Tropical." See Exhibits H and Z. It is not clear from the record before me whether title was intended to be taken by PTI, the dissolved corporation, or by Mr. Andrade, using "Promociones Tropical" as a dba. Compare Exhibit I, at pp. 1-2 with Exhibit Z, at p. 25. In the Andrade Complaint, Mr. Andrade asserted that he intended the Loan Transaction to be nothing more

Page 10 - MEMORANDUM OPINION

than a loan, secured by real property, including the Property.  Mr. Andrade further asserted that Mr. Schaller falsely induced him to enter into the Loan Transaction by preparing

> a bargain and sale deed from the Borrowers to [Mr. Andrade] and had [Mr. Andrade] then enter into a real estate contract with the Borrowers for the sale of the property from [Mr. Andrade] to the Borrowers, rather than a note and security document. . . .

Andrade Complaint, Exhibit I, at p. 3.

Ms. Steinhauser testified that she never intended to transfer title to the Property when she signed documents for the Loan Transaction. Ms. Steinhauser continuously has maintained and occupied the Property since the Loan Transaction closed, and she has paid the real property taxes for the Property continuously since at least 1996 up to the present.

Based on this record, I find that whatever was intended with respect to a loan to the Partnership, neither Ms. Steinhauser nor Mr. Andrade ever intended that ownership of the Property was to be transferred from Ms. Steinhauser to Mr. Andrade.

Defendants argue that Ms. Steinhauser is not entitled to prevail on her equitable quiet title action because she has "unclean hands," in that she admittedly never made a payment on the Loan Transaction obligation, even though at the trial of the Andrade Complaint, she testified that she would try to pay Mr. Andrade.  I find, based on the record presented at the Trial, that Ms. Steinhauser was pushed into signing the Loan Transaction documents by Ms. Lanier, without understanding what the Loan Transaction documents meant on their face, because Ms. Steinhauser was given no meaningful opportunity to read or

Page 11 - MEMORANDUM OPINION

consider the Loan Transaction documents.  Later, when confronted with what she had signed, Ms. Steinhauser was cornered and testified at the trial of the Andrade Complaint that she would try to pay Mr. Andrade. Subsequently, Mr. Andrade never made any effort to collect his "loan" from Ms. Steinhauser or the Property.  The issue as to title to the Property lay dormant for many years thereafter until Ms. Steinhauser raised the issue in this Adversary Proceeding.

## Conclusion

In these circumstances, the affirmative defenses of unclean hands and estoppel do not avail the Defendants, and I ultimately conclude that it is appropriate to quiet title to the Property in the name of Ms. Steinhauser.  Accordingly, I will deny Ms. Andrade's Motion to Dismiss the first claim for relief stated in Ms. Steinhauser's Complaint, as amended, and dismiss Ms. Andrade's counter-claim stated in her amended Answer.  ORS § 12.140, Oregon's ten-year statute of ultimate repose, supports this conclusion, as no claim was asserted in behalf of any of the Defendants to claim or maintain any ownership interest in the Property between the closing of the Loan Transaction in 1993 and 2009, when the Adversary Proceeding was filed.  See Woodriff v. Ashcraft, 503 P.2d 472, 474-75 (Or. 1972).  However, to the extent Ms. Steinhauser has asserted adverse possession as a basis to quiet title to the Property in her name, I do not find her argument persuasive, since her occupation of the Property never was hostile or contested, either before or after the Loan Transaction closed.  Accordingly, I will grant Ms. Andrade's Motion to Dismiss the second claim for relief stated in Ms. Steinhauser's Complaint, as amended.  In addition, the evidentiary record does not

Page 12 - MEMORANDUM OPINION

support Ms. Steinhauser's claim in her second amended Complaint that she was defrauded by Mr. Andrade.

While consistent with the foregoing findings and conclusions, I do not find in favor of the Defendants on the counter-claim to eject Ms. Steinhauser from the Property and confirm ownership and possession in the estate of Mr. Andrade, I am persuaded that it is appropriate as a matter of equity to make an award in Defendants' favor to prevent unjust enrichment: Ms. Steinhauser admitted that real property taxes accrued against the Property in the amount of $3,628.09 were paid from the proceeds of the Loan Transaction. She benefitted personally to that extent from the Loan Transaction and avoided further accrual at the state statutory interest rate of 16% on unpaid real property taxes. See ORS § 311.505(2). Accordingly, I will award an equitable lien against the Property in favor of the surviving Defendants, to be allocated among them as they determine to be appropriate, in the amount of $3,628.09, plus interest accrued at the Real Estate Contract rate of 10%, from the closing date of the Loan Transaction until paid, except as otherwise agreed among the parties. I will deny Ms. Araiza's Motion to Remand (Adversary Proceeding Docket No. 85).

Finally, I find that the interests of all Defendants have been adequately represented in the lengthy proceeding to date, leading up to the Trial in the Adversary Proceeding, and I will deny Ms. Andrade's Motion to Appoint Guardian Ad Litem (Adversary Proceeding Docket No. 89).

Counsel for Ms. Steinhauser shall prepare and submit a judgment consistent with the conclusions set forth in this Memorandum Opinion.

###

cc: Richard J. Parker
    Promociones Tropical, Inc.
    Andrade Baldomero
    Ruth Araiza
    Roger A. Hennagin

Page 14 - MEMORANDUM OPINION